And we'll hear first from Mr. McCrum. Good afternoon, Your Honors. May it please the Court, Counsel, Michael McCrum for Dikar Moparty. This case involves, Your Honor, a breach of a litigant's duty to stay within the lane of permissible evidence. The breadth of the government's breach in this case is wide. It caused substantial prejudice to my client, Mr. Moparty. In seven days of trial, every single day except the second day involved a breach by the introduction of impermissible information or evidence. This involved five different categories of impermissible evidence. This is not a situation where it's an isolated or inadvertent or incidental mention of something impermissible. This is a pattern of repeated erroneous or extraneous prejudicial information. The first two categories of those five categories, Your Honors, is the introduction of information to the jury that co-conspirators had been convicted, pled guilty. The first category would be the mention to the jury that Sidhu, a co-defendant in this case, had pled guilty. That happened on the first day during opening statement, and it happened on the last day of the government's evidence, the second to the last witness by the FBI case agent, where they mentioned to the jury that he had pled guilty, and that's the reason that he was not there. It was invited by the prosecution. It was not inadvertent. It was clearly a question asked. They had already represented to the court on the fourth day of trial that he was not going to be called as a witness, and yet they introduced that the seventh day, the sixth day, the last day of the government's testimony. The second category is the introduction of information on the fourth day. If the Sidhu guilty pleas are on the bookends of the first and the last day of the government's evidence, this happened on the fourth day, right in the middle. It also was invited by the prosecution. They said, tell us about the doctors who reviewed these neurological tests, and they were going into a line of evidence that it was improper. It was not properly done, and the medical expert, Dr. Grant, testified, yes, I looked into him. I researched Google, and he has been convicted of health care. Now, the question is, was that an inadvertent testimony? Who was he referring to? Dr. Grant is a witness, and Mr. Ahmed, A-H-M-E-D, judge.  Yes, Your Honor, Dr. Grant was referencing the three doctors who were reviewing neurological tests and explaining why these tests that were administered were not medically necessary or appropriately done. The prosecutor asked, well, tell us about these doctors. Did you look into their history? Did you look into who they are? Yes, the doctor answered. I researched him on Google and saw that he'd been convicted of health care fraud, probably in this same building, referring to the courthouse. Now, again, the question is, was that an inadvertent statement by Dr. Grant? The court inquired of the prosecutor, and they said, did you know that he had done this research? The prosecutor said, yes, I knew. They said, did you tell the defendants that he had done this research and knew this? No, I didn't. And then the prosecutor sought to justify the admission of that evidence, indicating that the prosecutor was aware that this information was going to come before the jury. The prosecutor said, it's admissible, Judge. He's an expert, and he's entitled to talk about what he researched about these unindicted co-conspirators. The court sustained the objection, gave a very short, limiting instruction, and it moved on. That is a second category of impermissible evidence that was brought before the jury. The third category, Your Honor, is the colloquy between the prosecutor and its last witness, the FBI forensic analyst on the sixth day of trial. And there, the prosecutor goes through a litany of naming the counts, the last three counts of the indictment, referring to the crime charged as money laundering. Very specific. This goes to the issue of whether or not the prosecutor and the witness is introducing descriptive conduct, descriptive words of facts that happen, versus an opinion as to the ultimate legal issue that the jury is to decide. Counsel, was there any defense to the money laundering other than that the underlying health care fraud wasn't committed? Because it seems it's just a spending money laundering. It is clear that the only defense is the knowledge of the illegality, which would be the health care fraud. You're right, Your Honor. So I guess I don't see, even if there's error with what you're talking about in the agent's testimony, I'm not sure how labeling it money laundering is really problematic. Because to me, the whole case seems like it turned on the health care fraud, and I understand your arguments on that. But I'm just trying to see what's the prejudice on the money laundering if that – I mean, it seems like it just followed necessarily from a health care fraud conviction. I would say two, Your Honor, two different forms of prejudice. Number one, the prosecutor, both in her opening as well as her closing, as well as in this questioning of this witness, described the money laundering crime as a trickling down of money. And so there was – the jury had already heard that. When a witness, particularly an FBI forensic analyst, comes before the court, before the jury, with that level of experience, the witness is giving an opinion as to the ultimate issue. He is guilty of money laundering, which is inappropriate. It's completely – the prosecutor asked, what does this show you? What is it? It's money laundering. Secondly, Your Honor, the witness did get into the scienter element, which you're referring to. The prosecutor in this colloquy said, what are the – this has the characteristics of money laundering of these counts because so many entities were used? And he said not just because of that. It's because the way they moved their money. It get into why is that money laundering? And the answer by the witness was they were trying to keep an arm's length. There was a scienter element introduced by the witness. And so it was all being infused not only with the acts of money flow, but the scienter element of money laundering was also introduced in this colloquy between pages 2129 of the record and 2157 of the record. And so there was repeated instances by the prosecutor eliciting an opinion as to the ultimate legal issue. Fourth category is that the prosecutor invited expressions of guilt from other witnesses, from one of the experts. When he was describing this medical procedures, they said, what is it? Well, it's fraudulent. It's illegal. They would ask the insurance representatives, are these violations of law? Repeatedly asking witnesses to opine and come to a conclusion that something's illegal or fraud, which this court has issued several opinions that is improper for a witness to do. The fifth category, on top of all this, is whether or not the government introduced extraneous prejudicial information of other types of criminal conduct. And I've set most of those out in the brief. They asked, is this a violation of HIPAA protection laws? The objection was sustained. The prosecutor said, well, they're selling private information on the dark web for money. Alleged criminal conduct, which objection was made. It was sustained. They said, these are kickbacks and they're illegal. Objection. It was sustained. This involved an illegitimate sale of land. Objection. Sustained. This court has, in Fleetwood, said, will a cautionary instruction be enough to combat that? Will it override this prejudice? In Fleetwood, they said, reference to a co-defendant's guilty plea alone is a type of aggravating circumstance that renders a strongest corrective instruction insufficient. This court in Riddle said the same thing. The cumulative effect of repeated errors cannot be cured. Yes, Your Honor. Mr. McCrum, you did present all this to Judge Lake, right? And he wrote on it and he commented that this was not good behavior. But then he found the errors harmless. That was on the motion for mistrial, Your Honor. And I would point the court to two flaws that I think are on the court's order, the district court's order. Number one, on page 10, the court says the government likely knew that they would not be calling Sidhu before Agent Lambman's testimony. Well, the government did know. And so the court flat misinterpreted whether the government knew or not that it was not going to be calling Sidhu. The government had told the court three days before that that he was not going to be called. Secondly, Judge, on the order of denying mistrial, the judge, the district court, treated the Sidhu guilty plea exposure and the Ahmed conviction for health care fraud separately. And we're asking this court, you should consider them cumulatively under the case law that this court has held. My time is up. All right. Thank you, sir. Thank you, Your Honor. Mr. Kretzer. Good afternoon. May it please the court, Seth Kretzer for Dr. Narang. Your Honors, I'd like to begin my argument today basically taking the baton where Mr. McCrumb left off and then turn into the numerosity of victims as beneficiaries argument. The one thing I would add to what Mr. McCrumb said about this issue with Dr. Sidhu is that I don't think there's any doubt the government knew throughout the trial and arguably even going into the trial that they were not going to call Sidhu. Everyone knew that Sidhu was terminally ill. He passed away after the trial. They took his material witness deposition for that reason. Everyone knew his time was limited. They didn't actually finish the deposition. I'm not totally clear why. At the time, the reason was there was some – it was the government shutdown. They didn't have the money to resume the matter. I think why this is important, Judge, is one issue that Mr. – or aspect of Judge Lake's order on the motion for mistrial that Mr. McCrumb didn't have a chance to mention, and that is that Judge Lake has said when Mr. Clark, Dr. Narang's defense counsel, approached on this issue, Judge Lake said, well, couldn't you subpoena Sidhu? Well, I'm sure, yes, it's a positive matter. I know he could have subpoenaed Sidhu, but there are any number of reasons why Mr. Clark would not have wanted to do this. There's no other reason that the guy was obviously incredibly ill and would have been very frail, and if we had brought him into court, that would not have made us look good. Regardless, it put us in the position of then having to request not once but twice Judge Lake instructed the jury to disregard Mr. Sidhu's testimony. That's why I would argue that element of bad faith and that Judge Lake's curative instruction should not be enough to cleanse the issue under these circumstances. Judge Lake even said the first prong of the King factors went in Dr. Narang's favor. We think this is a unique case where the curative instruction should not be enough to go the distance. If I could turn to the argument about the Medicare beneficiaries as victims enhancement. For methodological convenience, I'll refer to that today as the Barson rule, but it's really an issue of the Barson dissent and the concurrence in ANABI, and this has come up in a handful of other cases. Ms. Cowie, I'm probably mispronouncing it, had an opinion from this court in fall of 2019. We're in footnote four. They went through this dichotomy at some length. I think there's any number—well, let me present my argument this way. As an initial matter, I think this court can reverse in this case even under the logic of Barson. In Barson, at least some subset of the 420-some-odd Medicare beneficiaries who qualified as victims had been engaged in the wrongdoing, and they arguably might have been criminally culpable if not indicted. In the Ms. Cowie case that I mentioned a second ago from fall of 2019, these folks apparently had very bad Alzheimer's. They were sort of tricked into going to the clinic, and in that sense— But weren't the patients here victimized financially, unlike a lot of these other cases? Because as I understand the scheme, they're bringing these folks in. They're doing unnecessary tests. On top of that, they're often charging out-of-network instead of in-network to these folks. So my understanding is the patients are getting much larger bills than they should have, so that's even a financial loss. If part of the scheme is to bill people under an out-of-network rate, we know that's going to be much higher for the actual patients portion of the bill as well. Judge Costa, I looked at this in some detail. There is not a single—in the indictment and in the PSR, there were three victims identified, Cigna, Aetna, and Blue Cross Blue Shield. The big issue going up into sentencing was whether it was $20 million or $3.2 million that those insurance companies paid. I would submit the error of the logic, the reason that Barson needs to be corrected, is that as we sit here, nor in the PSR, nor can the government identify a single penny that those folks— maybe they got the bills, but it was paid by their insurance carrier—that these folks had to pay. In other words, yes, they got these bills, but it was— But if it's out-of-network, that means your insurance isn't going to pay for as much. Well, the insurance—I think the testimony from the folks who came from the insurance company, Judge Costa, was that they would not have paid if they knew it was fraudulent, but they did pay, at least under the metric that they do pay. That, of course, is this big issue between the actual unintended loss. Everyone knows no insurance company pays the—or very few, rarely. It would have been easy enough to ask the people who testified whether they went out-of-pocket, wouldn't it? Yes. But there's no such testimony. I don't believe there's testimony that any of these folks had to go out-of-pocket. Exactly. It's certainly not going up into the sentencing hearing. I mean, I understand sentencing is a preponderant standard. It's not the rules of evidence. But probation never even addressed Judge Jones. Any of the PSRs, the addendums, so forth, never addressed any of these Medicare beneficiaries as being victims. And that's partly—well, one, because I don't think they are victims, and it wasn't anything that they said. Right before footnote number one in the Barson dissent, the sentence leading up to that footnote, said that the court—in that case, obviously, Barson tersely adopted the government's argument. And I was struck by that adjective, tersely, reading my friend Ms. Wilson's brief on page 87 and 88 of her brief. She never even actually engages my arguments about victim status, out-of-pocket, the commentary, so forth. She just simply said, well, just like probation did, Barson is the rule, and therefore we can do it. And yet nobody can tell you, Judge Jones—I would submit I cannot. I don't think there's any evidence in the record what these folks—how much they had to pay. How much of a difference would this make? A two-level increase. I understand, but how much in terms of restitution or sentencing or whatever? It would not affect restitution. The only three restitution victims are those three insurance companies. Sentencing? Sentencing, yes. It would be guidelines impactful in that Dr. Narang was given concurrent sentences of 120— basically is doing an absolute value of 121 months. If we were to prevail just on that one objection, the two, the highest point on the lower guideline range would be at 121 months. So Judge Lake might impose that same sentence again, but having chosen the very lowest point on the higher range, I don't think there's any reason to think he would have picked the very highest point on the lower range. You're reminding me. I'd forgotten that. Okay. Yes. So we have that. And even further, Judge Lake even said—it was a very extensive, long sentencing hearing— he even said when he got to the 3553A factors that several of the characteristics of Dr. Narang's personality, giving free medical care to the indigent and so forth, militated in favor of a lower sentence. He ultimately didn't go there. But if the error was guidelines impactful, he might be swayed by that argument. And in addition, Dr. Narang has surrendered. So we'd have the arguments under United States v. Pepper and post-offense rehabilitation. But we would submit the correct disposition for this court would be to reverse so those arguments can be made to Judge Lake in the procedurally correct sentencing framework. Okay. Thank you. Ms. Wilson. Let me just ask you to begin with, why did the government ask to file a 137-page brief? Well, Your Honor, we were responding to two briefs, and there was a lot of testimony. So we wanted to lay it all out. It was unopposed, and that's why we did it. Frankly, I—well, let me just—and I speak purely for myself and my clerk who did the bench memo. I've never seen a 137-page brief before, maybe—I mean, except maybe in multi-drug trafficking cases with eight defendants. The facts in this, although the interrelationships are somewhat complicated, are not unusual. The amount of the punishment is certainly not out of the ordinary in Medicare fraud, and I would just urge the government to think about the court when you have to file another brief like this. Well, Your Honor, I apologize. I don't think—I think in my entire career, maybe I've filed two briefs that are over 75 or 80 pages. So I apologize, but— Well, I'm not—this isn't personal. I'm just—it is to me, but I'm not saying that to you. Well, one of the points I will get to in a second and may explain this a little bit more is, our first point is that the court should uphold the jury's verdict. Mopardi and Dr. Narang defrauded patients and insurance companies using the pass-through and double-billing schemes. As we've discussed before, they were billing for unnecessary, problematic, and even non-existent tests. The government agrees mistakes were made, which is in part why a longer brief was filed, because we have to show that the court's decisions were correct or that we meet the relevant standard of review. And so, I think that the big mistake is this reference to the plea the second time when it looked like everyone knew Sidhu wasn't going to testify. What was the explanation for that? I'm not sure I still have the explanation for why it happened. I don't think there is an explanation. It shouldn't have happened. And that's what I'm saying. The government agrees. And so, here we are facing high standards of review in many situations, whether it's plain error or abuse of discretion. In relation to the Agent Lammon's testimony that you referenced, they did object. So, the standard is lower. But what Judge Lake did was two things. First, he immediately gave a contemporaneous instruction. And secondly, he told the parties to submit an agreed instruction, which he then submitted to the jury. So, he appreciated what was going on. But as this court knows, juries are presumed to follow instructions. And there's no evidence in this record whatsoever that the jury had any problems doing so. In fact, I looked at the docket sheet, and I was surprised to see that the jury did not submit any notes while they were deliberating, which I thought was very unusual. But I did want to check that. But the point is Judge Lake was looking out for the record. And if you look at everything here, you have forceful instructions where they are necessary. So, some of the—I guess the focus here is the Anderson testimony, which is the forensic accountant, and that's pretty much under plain error review. That's obviously a very high standard. The second one is Agent Lammon's, which I just discussed, and Judge Lake did the contemporaneous and then the jury's charge instruction. We also have the statement during—excuse me, the mention during opening argument or opening statement, rather, of Dr. Sidhu's guilty plea. Judge Lake, in the motion for a new trial, in the order there, he found specifically that there was no evidence that the government didn't intend to call Sidhu as a witness, that we arguably had a legitimate purpose to preemptively counter the defendant's future efforts to impeach. And I know that they think that that issue wasn't right yet, but it's kind of one of two things when you come to the standard review there. Was it so prejudicial that you should have objected, and therefore plain error review applies, or was it, in fact, not right? The court can decide what the appropriate standard is there. But then we get into the Lammon's, which, of course, they discussed as bookends. But the fact of the matter is, and I said before, the government agrees that mistakes were made. You know what? I mean, if it takes you 137 pages to justify your candidate admission that mistakes were made, maybe that means we really do need to vacate and remand. I don't think that's correct, Your Honor. Well, I mean, again, I've never—I mean, I certainly appreciate your candor in this, but you're basically admitting that there were repeated mistakes. Well, Your Honor, I agree that the Agent Lammon's statement should not have been made. Yeah, but I mean, how many lawyers did the government have in that courtroom? I believe just two. Well, it seems to me that one of them should have been knocking the other one in the ribs. Maybe that happened. I have no idea. But what I do know is that if you were referencing, if you will, cumulative error, this court rarely applies that. And in the situations where that does, it's very extreme. The two cases cited in their brief, one was where the court gave the jury an unconstitutional presumption and a jury instruction. We don't have that kind of problem here. The other one was where there were so many errors, the jury was confused, they couldn't argue the case correctly and all of that. That's not the situation here. If you put those errors aside, what you have is a plethora of evidence in terms of coming from witnesses who said that they shouldn't have had these tests and whatnot. And then, of course, I know that applies. You know, I do not—there are crimes that, let's say, involve mutilation of children, where one can understand why the government might get sort of emotionally involved in a case. This is not that kind of crime. This is a very garden-variety Medicare fraud, although rather clever if we sustain the judgment, in comparison to those that have involved tens of millions of dollars, which we have seen. I do not see any excuse for the government to play foul. And, you know, I'm beginning to become a little skeptical of the U.S. attorneys when they say, ah, mistakes were made. No, a person makes mistakes. Mistakes don't make themselves. I don't disagree with that, Your Honor. No, you don't, and that's the conundrum here. Somebody should have been taken to the woodshed. Well, I can't speak to what did or did not happen in relation to the trial lawyers here. All I'm here to do is explain why the case should not—you know, why it doesn't warrant reversal. And what you have are twenty-three witnesses who testified, and if you put that testimony all aside, the ones with, you know, Agent Lamens and all the other ones, you still have a plethora of documents. The jury could see emails involving Moparty, because Moparty is the only one that's challenging the sufficiency of the evidence, so that's why I'm speaking more to him. But you have a bunch of text messages. You have emails. You have documents. Then you have all these millions-of-dollar, like, one-page leases that are very suspect documents and transactions and things of that nature, and the jury could see all of that. So even though, as I said before, we agree that certain statements should not have been made, you still have two defendants who committed very serious crimes. Whether they're garden variety or not, the fact of the matter is they billed for $20 million three private insurance companies. And unlike some of these other cases that Mr. Kronzer was talking about, these were private pay people. These aren't Medicare beneficiaries or Medicaid or anything like that. These are people that had to pay for their medical care. Well, I don't find the evidence of that. My understanding was that you were talking about the three insurance companies, so I would appreciate it if you'd get over to the ten victims issue. I will address that. What we had in one of the charts that's in the record, it shows that 400 people, or I think it was . . . well, I can't remember if it's 400 people or 400 claims were submitted. All of these people are private pay. I'm familiar with this, as you know. Yes, I do know. Why are they victims, unless the government introduced money that they went out of pocket? Well, it's also a level of common sense here. You do have the witnesses testifying, some of the Groupon patients, and then EL, the one who was charged over, I think it was $800,000 and then told it's a mistake. We all have to pay deductibles and things like that with insurance, so we are out of pocket. I mean, that's just a common aspect. But sentencing's not limited to the trial record. Pardon me? Sentencing's not limited to the trial record, right? Right. I don't know if there's anything in the . . . is there anything in the pre-sentence report? Is there . . . pardon me? Is there anything in the pre-sentence report or otherwise that would show what these individuals were facing? I don't recall an itemization, if that's what you're talking about, because, in fact, they haven't raised anything about the money. I mean, $20 million was billed, roughly $3.2 million was paid out, and they agreed on restitution for like $2.6 million. But we're talking about a sentencing enhancement of two points for the number of victims. I understand that. And you're saying that even if there's nothing in the trial record or in the PSR about how these individuals had to pay or not pay under their particular policies, that we can presume they were victims? Well, a victim, by definition, is any individual whose means of identity was used, correct? Well, that's a whole other issue. I understand that. We wouldn't get into it if we didn't have to. But if you're asking me, again, if there was an itemization per victim, I don't believe so. But what you can do is look at those charts and see the differential in the pay. I mean, the whole point of this, right, is to be able to bill river— excuse me, ROH is able to bill at these out-of-network amounts and recover a lot more money. And there are charts that show, and I discussed it in the brief, what Narang would have made versus what River Oaks was paid. I understand that based on the insurance companies being the victims. Okay. Because the entire amount of loss is calculated on what those companies paid. It is not calculated on the basis of deductibles, co-pays, out-of-network, or higher premiums. But that's always going to run down to the insured. The insured is always going to be responsible for whatever they're deductible. You know, it's sort of—I mean, I'm not—this just occurred to me, so it may be transparently stupid, but it's like those national bank cases where the government forgets to introduce evidence that the particular bank was a national bank. You're claiming there are ten victims, but you only put on trial three insurance companies and the rest of this, the record may be bereft of evidence of that. Yes, but also with the PSR, if the evidence or whatever supports it, then the burden shifted to the defense, and they didn't do anything about it either. Well, they objected, right? They objected to paying, but to the extent that they thought that there was a void in the money, then they should have come forward with more detail. I'm telling you, I'm—well, okay, I'm not trying to— If we've already—if the court has already held that Medicare beneficiaries are victims, then it's even more true with a private pay. They're paying their premiums. They're paying their deductibles and things like that. With a Medicare, you're maybe paying a little bit, but the government, the taxpayer, picks up the bill. That's not true with private pay. So, and by definition, victim is very broadly defined. There's a lot of case law on that. So, to the— Can I ask a question? How come the government didn't add an additional point in each indictment for identity theft based on the theory of the Duvin case that we just heard en banc? I can't answer that, Your Honor. I don't know. What are the charging criteria for that 1857 or whatever that identity— 1028A? 1028A, that so-called aggravated identity theft. I can't answer that. I'm not—I wasn't involved with the charging. Well, that was a Medicare fraud, and I think it came out of Texas. Dallas. I think it was Dallas. Dallas, Northern District. I was wondering, because everything you are arguing about use of the victim's identity is pertinent to that 1028 as well. But they also just—this was in relation to the sentencing, where the focus was on the healthcare fraud, the existence of the fraud, and then the laundering, the money laundering, and that's what they were proving up at trial. Now, maybe the prosecutors tried to do it, and the supervisor said no. I just can't answer that question. But— Counsel, let me ask you. We've certainly talked a fair amount about the errors made, and you've conceded them. Pardon the what? About the errors that were made, and you've conceded a fair number of them. Looking at the sufficiency of evidence against the appellant who is raising that, his defense, as you know better than I, how he set it up, it seems to me that injecting that one of the doctors, who he says he didn't know what they were doing, he was just arranging for the payment of the bills, submission of the bills when he got them, one of those doctors had conceded that what he was doing was fraudulent. So it does seem to me—I do understand why Moparte is making that argument. What was his evidence on the role of the law firm that we see in the briefing, Strasburg and Price, and their setting—any involvement they may have had in setting up this off-premises department at River Oaks Hospital at North Cyprus for the handling of a lot of the treatments that he was then submitting the bills for? What evidence was there that the government would have to respond to, but had the benefit of this guilty plea in front of the jury, that he did seek legal advice? It's minimal. I did a search on Strasburg and Price, and it was a long time ago, but I want to say there were easily less than five references. They're just assertions. If you look at the documents that we would argue that they tried to paper trail, it does not look like they were prepared by lawyers at all, what you typically see of a lawyer document. You have the unusual situation here where Moparte actually testified, and he tried to explain to the jury what the role of the hospital was, what his role was, how he was trying to expand his business. He did all of that, and the jury obviously rejected it. Does that answer your question? It tells me what you recall from the record. It tells me what? What you recall from the record. I don't think this plexiglass is helping me much. Could you ... No, go ahead. Go ahead. I want to know what was in the record to support that he got legal advice, that he was oblivious to what the doctors were really up to. Then you have this doctor guilty plea injected into that mix, and how that might have impacted him. I do see that evidence as being particularly harmful to him. I just wanted to see whether ... Obviously, we give an awful lot of credit to the jury, but affected by these sorts of errors that have occurred in the prosecution. I'm trying to get a handle on what seemed to me to be a particularly strong piece of evidence if it was there, that setting up this HOPD, he had the assistance of lawyers, and this is what he thought he was supposed to be doing. It's false. There's very little reference to Strasburger and Price, as I mentioned. Also, where he's trying to say that he got advice was from the Texas Department of Health, and I believe ... Of course, I cite it in the brief, but there's an email exchange with him and the different people at the Department of Health, and he's asking them questions and whatnot. At the very end, you will see where they specifically tell him, look, you need to get legal advice. We're not here to give you legal advice. We can give you some help. We can give you some guidance or whatever, but in fact, what we contend he was doing was trying to cover his tracks. If you look at some of the text messages between Narang's wife and him or Narang and him, you'll see that they speak, and I use this word very loosely, code, meaning like they're trying to say certain things, but they're using certain buzzwords so as though it looks like it's fairly benign, if that makes sense, and some of the emails were the same. Where you also have the straight testimony about him being in on it, his longtime billing director or medical director, I forget the exact title, was called into a meeting in which Narang, Narang's wife, and Moparty were there, and they said, okay, we're going to be doing some billing together, and the fellow's name is Keon Warren, and Warren talked about how he would get these emails from Narang's office about what to do or not do, and in particular, there is an email, it's GX126 at 4445, I believe, in which Moparty says, look, attached are 65 pages of patients, and nobody, excuse me, insurance didn't pay a nickel on this. We need to, you know, we need to get this figured out, and so it's things like that where there's a lot in the record to that effect. All right, counsel. Thank you. Thank you. Judge, if I may. Yes, sir. Thank you, Your Honor. Judge, if I may follow up on your questions. Did you hear my question? Well, I think . . . Go off the angle here. With respect to Strassburger Price, there was two mentions of it. One is Mr. Warren, who was handling the billing for Red Oak, as well as Mr. Warren's, and the other was that Mr. Warren had actually drafted a purchase services agreement that was introduced into evidence. A program management agreement was drafted by a different attorney that they consulted with, and that was testified to by Ranjit Kaur. Now . . . Did you ask for advice of counsel defense? No, sir. Which you know does happen in these fraud cases on occasion. Yes, sir. It was not raised by the trial attorneys in this case. With respect to why we would focus so much on the mention of Sidhu's guilty plea with respect to Mr. Moparty, there's a couple reasons, Judge. One is that if you look at the evidence, the colloquy of Agent Lamans, before the mention of Sidhu's guilty plea on that sixth day of testimony, the prosecutor went at length between Mr. Moparty and Mr. Sidhu's interaction as far as sending documents and not sending documents. After the mention of the guilty plea, which was the objection was sustained, there continued with the colloquy of showing the interrelationship between Mr. Moparty and Sidhu in the sense of financial documents. He had only met him once and spoke with him once, but it was clear that the government was trying to tie them in. That's one thing. Secondly, there was evidence by the government that Ranjit Kaur, who was the program manager that was hired, is the wife of Mr. Sidhu. And they showed extensively how Mr. Moparty had hired Ranjit Kaur and looped in Mr. Sidhu with Ranjit Kaur and Mr. Moparty in the evidence. And so there was a concerted effort through Agent Lamans, as well as the last witness, Ms. Anderson, to show Sidhu and Mr. Moparty. Also in the cross-examination of Mr. Moparty, they kept asking him questions about Mr. Sidhu, Dr. Sidhu. He, of course, didn't deal with him, but they were, I think, trying to create a scenario that they were more interrelated than they were. And so there's a great prejudice in the jury having heard that Dr. Sidhu had pled guilty when there's this constant questioning. As far as the state of the evidence, I've got 20 seconds left. I would ask that the court consider the strength of the evidence of Mr. Moparty way different than Dr. Narang. Why? Because there was no evidence that Mr. Moparty knew of the medical issues that they tried to prove were medically unnecessary, nor as to the second issue as far as the HOPD and whatnot. The government's case rested on the interpretation of provider contracts, these insurance company contracts that said, we needed to know where you performed that service. Well, there was no evidence that Mr. Moparty ever had seen those contracts, were a party to them, even knew that. He just researched HOPD, which the insurance companies represented. The forms that they filed indicated it was outpatient. If HOPD does exist, it was legal, and so the sufficiency of the evidence question is way different for Mr. Moparty versus Mr. Narang. I'm out of time. Thank you, Your Honors.